### Fox *against* ABEL and another.

THIS was an action of assault and battery and false imprisonment, alleged to have been committed at *Franklin,* on the 29th day of *December,* 1816.

The cause was tried at *Norwich, January* term 1818, before *Swift,* Ch. J., and *Brainard* and *Goddard,* Js.

The defendant, *Abel,* was a constable of the town of *Franklin;* and had in his hands for collection, a legal execution, in favour of one *Palmer,* against the plaintiff. The 29th of *December,* 1816, was *Sunday.* After midnight, preceding that day, and before the next succeeding day-break, *Abel,* with the assistance of the other defendant, levied this execution on the body of the plaintiff, and committed him to prison. The court charged the jury, that the *Sabbath,* or *Lord's day,* extended from the next preceding, to the next succeeding midnight, embracing a period of twenty-four hours; and that service of any civil process within that period, was void by

The *Lord's day,* on which service of civil process is prohibited by statute, comprises the *solar* day only.

*Hartford,*
*June, 1818.*

Fox
*v.*
Abel.

statue.(*a*) Consequently, the process in this case, was no justification to the defendants.

The jury found a verdict for the plaintiff; and the defendants moved for a new trial, on the ground of a misdirection. The court reserved the motion.

The case was argued elaborately, by *Lanman,* in support of the motion, and by *Goddard,* contra. The principal topics of argument, which they urged, and the authorities, which they cited, are adverted to, in the opinions of the Judges.

SWIFT, Ch. J.  The question is, whether the statute, by the words " *Lord's day*," means the *natural,* or *solar* day.

It is a well known rule of the common law, that a day comprises twenty-four hours, extending from midnight to midnight, including morning, evening and night, and is called the natural day. When a day is spoken of in law, it comprehends that period of time. When an act is to be done on a particular day, it may be done at any time between those hours. 2 *Black. Comm.* 141. And, of course, a prohibition to do an act on a particular day, must comprise the same period. If the service of civil process should be prohibited on *Monday,* the prohibition would reach from midnight to midnight. Of course, when the statute declared, that if any civil process should be issued and served on the *Lord's day,* it should be void, and of no effect, it must, *ex vi termini,* comprehend the whole twenty-four hours, unless something can be collected from the statute itself, to warrant a different construction.

It is contended, that from certain expressions in the statute, it is evident the legislature meant by the *Lord's day,* a solar day, including only the time, from the rising to the setting of the sun. In the 6th section of the statute, *Innkeepers* are prohibited from entertaining people *on Saturday night after sunset, on the Lord's day, or on the evening following.* Now, it is said, if the *Lord's day* comprehends the whole time till midnight, then the *evening following* cannot be the evening of the *Lord's day,* but of the succeeding day : but as it is manifest, the legislature meant the evening of the *Lord's day,* the consequence follows, that they must have considered

(*a*) 1 *Conn. Stat. tit.* 140. *s.* 12.

the *Lord's day* to be a solar day, and then the evening following would be the evening of the *Lord's day*, and make the statute consistent. But if this reasoning be correct, there can be no evening of a natural day. For when we say the *Lord's day*, or the evening following, if the evening following cannot be the evening of the *Lord's day*, because it extends till midnight; then if we use the expression, *the evening of the Lord's day*, it will be equally incorrect; because the *Lord's day* extends till midnight. The question, then, is reduced to this point—whether any part of the natural day can, with legal propriety, be called *evening?* That the expression, *evening of a day*, with reference to the natural day, is proper, may be proved by the authority of Lord *Coke*. " Of days, some are natural, and some are artificial : the natural day consists of twenty-four hours, and comprehends the solar day and the night ; and therefore, in indictments of burglary, and the like, we say, *in the night* of the same day." *Co. Litt.* 135. Here, the subject is fully explained. Though the natural day consists of twenty-four hours ; yet, as it comprehends the solar day and the night, we speak of day and night within the period of the natural day, to distinguish the different parts of the day. Hence, the propriety of the expression, *the evening of a day*, or, *the evening following a day ;* and they have both the same import in common understanding, and are used with equal propriety in reference to the solar day, and the night, as comprehended in the natural day. We make use of language appropriate to the solar day, not because we adopt it, but for the purpose of distinguishing certain portions of the natural day. This is owing to the poverty of our language, but will warrant no inference, that when the legislature used the word *day*, they intended a solar day.

It is further objected, that on this construction these words can have no operation ; for the *Lord's day* comprehends the evening. This, however, constitutes no objection. It is nothing but a repetition ; and nothing is more common in statutes, than repeated prohibitions of the same thing, in different words. In the statute under consideration, all secular business is forbidden on the *Lord's day*, *or any part thereof*. These last words are but a repeated prohibition, and cannot affect the construction of the statute. Yet in the case under consideration, there seems to be some colour for this prohibition. The statute had prohibited certain things to be done

*Hartford*,
June, 1818.

Fox
*v.*
Abel.

*Hartford,*
*June, 1818.*

Fox
*v.*
Abel.

on *Saturday* night after sun-set, and on the *Lord's day.* Now, if the legislature had stopped here, it might possibly have been understood, from the words *Lord's day*, in connexion with *Saturday* night, that they did not mean to extend the prohibition to *Sunday* evening; and to guard against the possibility of such a construction, this clause was added.

It may also be remarked, that if the legislature had intended to have prohibited secular business only within the period of the solar day, they would have made use of appropriate and definite language; and it cannot be supposed, that they would have used words proper to express the natural day, and then have left it to be inferred from a verbal criticism, that they intended the solar day. If any doubt, however, can be raised by this section, it is fully removed by another. In regulating the sailing of vessels, they are prohibited to depart from any harbour, &c., *on the Lord's day, at any time between the morning light and the setting sun.* This language clearly shews, that the legislature did not consider the period of time between the morning light and the setting sun to be the whole of the *Lord's day*, but only a part of it. This, then, proves, that they did not in the statute mean the solar day. If the legislature, in the other parts of the statute, had, by the term *Lord's day*, meant only a solar day, then there could have been no possible reason for the introduction of these expressions into this section; for no one will believe, that they intended to restrain sailors between the morning light and sun-rise, when no other persons were restrained during that time. Indeed, it is evident if the legislature had considered the *Lord's day* to be the solar day, they would never have made this restriction with respect to sailors, but left them on the same footing with every body else. It is, then, conclusive, that they could not have understood by the *Lord's day*, the solar day. If the expression had been, *between the rising and the setting sun,* then it might, with some plausibility, have been inferred, that the legislature contemplated only the solar day, in the regulations of the statute; and that this was an exposition of their intent. But the extension of the prohibition to the time between the morning light and the rising sun, excludes such an inference, and demonstrates, that they never contemplated the solar day; for there might be some reason why the prohibition should be

relaxed in favour of sailors; but certainly none why it should be extended.

*Hartford,*
June, 1818.

Fox
*v.*
Abel.

The case of *Carpenter* v. *Crane,* 1 *Root* 98. has been referred to as an authority in point. Having been of counsel in that case, I am able to say the doctrine that *Sunday* comprehends only the solar day, was not then promulgated: it is a doctrine of a later date, and was drawn as a consequence from that decision; which was probably owing to the imposing equity of that particular case; a circumstance, which has often led to a deviation from principle productive of serious inconvenience in other cases. At any rate, however, a decision of the superior court, repugnant to the express provision of a statute, has never been deemed an authority binding on this Court.

I would not advise a new trial.

TRUMBULL, J. This is an action of trespass, charging an assault, battery and false imprisonment. Under the plea of *Not guilty,* the defendants rely on a justification, by the levy of an execution on the body of the plaintiff. The plaintiff alleges, that the levy was made on the *Sabbath,* or *Lord's day,* in the morning of that day, after midnight, and before day-break; and contends, that this levy, at that time, was unlawful and void.

This cause must be decided upon the true construction of the words in our statute, which enacts, that " if any civil process shall be issued or served on the *Lord's day,* it shall be void and of no effect; and the officer who serves the same, on said day, shall pay a fine of one dollar, sixty-seven cents, and all damage that shall arise to any person thereby."

Neither party, in this case, denies, that the *Christian Sabbath* must embrace a complete seventh part of time, *viz.* a whole day of twenty-four hours; nor claims, that the question, at what time this *Sabbath* commences, is precisely determined in any part of the statute.

If the exact hour and minute of the natural day, on which the *Sabbath* begins, be a matter of essential importance, we might certainly expect some explicit directions in the Scriptures. In *Leviticus,* xxiii. 37. an express rule was given to the *Israelites,* as to the day of atonement, which was to be observed annually, on the tenth day of the seventh month—

*Hartford,*
*June, 1818.*

Fox
*v.*
Abel.

"It shall be unto you a *Sabbath* of rest, and ye shall afflict your souls in the ninth day of the month, at even; from evening to evening shall ye celebrate your *Sabbath.*" But in respect to the beginning of the weekly *Sabbath,* no express direction is given; and it is certain, that the *Jews,* in the time of our *Saviour,* did not begin it before the dawn of the morning. This is clear, not only from history, but from two passages in the New Testament. *Matthew,* xxviii. 1.—"In the end of the *Sabbath,* as it began to dawn towards the first day of the week," &c. *Mark,* xvi. 1, 2.—"And when the *Sabbath* was past, very early in the morning, the first day of the week," &c. These passages are accurately translated from the original Greek; and from them it appears, that the *Jewish Sabbath* ended, and the first day of the week (which is now the *Christian Sabbath*) commenced, at the dawn of the morning. The *Jews* considered the preceding evening, as the time of preparation for the *Sabbath,* but not as a part of the *Sabbath* itself.

The *English* appear to have always divided days into *natural* and *artificial:* but at different periods, have affixed contrary meanings to those terms. The time, from the rising to the setting of the sun, was, by ancient authors, called *dies solaris,* and the night, *dies lunaris.* The *solar* day was termed the *natural* day; and the whole twenty-four hours, consisting of the solar day and the night succeeding it, was called the *artificial* day. But afterwards, and to the present time, the solar day was termed the artificial day, and the twenty-four hours, commencing from the rising of the sun on one day, and continued through the night succeeding, was styled the natural day. *Co. Litt.* 135. *a.* Different nations begin the day at different times. Lord *Coke* tells us, the *Jews, Chaldeans* and *Babyloneans* begin the day at sunrise; the *Umbri* in *Italy,* at mid-day; the *Egyptians* and *Romans,* from midnight; and so doth the law of *England,* in many cases.

Respecting the custom of holding courts, and serving legal process, on *Sunday,* Lord *Mansfield* has given the fullest history, in the case of *Swan* v. *Broome,* 3 *Burrow,* 1595. He informs us, that the ancient *Christians* not only allowed all kinds of legal process on that day, but held their courts open for the trial of causes, down to the beginning of the sixth century; but that afterwards, the practice was prohibited, by sundry ecclesiastical canons. These canons were received and

adopted in *England*, by their kings, in the time of the sovereignty of the *Saxons*. *Edward*, called *the Confessor*, made a constitution accordingly, forbidding the holding of courts " on all *Sabbath* days, after the ninth hour, and the whole day following until *Monday*." These canons and constitutions were confirmed by *William the Conqueror ;* and thus, says Lord *Mansfield*, became part of the common law of *England*. Hence, the *Lord's days*, *dies dominici*, became *dies non juridici*. 2 *Instit.* 264. By the *Mirror of Justices*, quoted *Co. Litt.* 135. and *Burrow*, 1599., it appears, that courts were forbidden, at the time when that book was compiled, to hold their sessions on that day, after the rising of the sun. By the *Lord's day*, in the *English* statutes, and the language of the elementary writers, is technically meant the solar day, commencing at sunrise : and it is certain, that no part of the preceding night was ever included in it. The prohibition against holding courts on that day, did not, however, extend to the courts of *chancery*, or *exchequer*. *Comyn's Dig. tit. Temps.* C. 5. And though no judicial act could be done, yet all ministerial acts, as the service of writs and process, might lawfully be executed on *Sundays*. *Mackally's* case, 9 *Co. Rep.* 66. Thus the common law stood, until by the 29th *Car.* 2., *cap.* 7. such service was prohibited, and declared void. 1 *Strange*, 388.

Lord *Coke* tells us, (2 *Inst.* 264.) " The *Lord's days*, are *dies non juridici ;* and this was the ancient law of *England*, and extended not only to legal proceedings, but to contracts." He quotes a sentence from the *English* laws before the conquest—" *Dacus, si die dominico quicquam fuerit mercatus, re ipsa, et oris præterea duodecim mulctator ; Anglus præterea triginta solidos numerato.*" By this law, whatever article should be purchased on the *Lord's day*, was forfeited, and the buyer, if a *Saxon*, should further pay a fine of twelve *oræ*, (a *Saxon* coin, of the value of about sixteen pence, sterling,) but if a *Briton*, of thirty shillings. So by the statute, 27 *Henry* 6. *cap.* 5. goods, exposed in fairs or markets for sale, on *Sundays*, were forfeited to the lords of the franchise. This statute could have effect, as to those hours only in the day, on which fairs and markets were kept open.

From these authorities it seems evident, that neither by the Scriptures, nor by the common law, was the time after midnight and before the dawn of the morning of the *Sab-*

*Hartford,* June, 1818.

Fox
*v.*
Abel.

*Hartford,*
*June, 1818*

Fox
*v.*
Abel.

bath day, ever considered as included in, or constituting any part of, holy time.

The statute of this state, (*tit. Sabbath, sec. 2.*) forbids all secular business from being done on the *Lord's day*, or any part thereof. Our courts, from the earliest times, have accordingly adjudged all contracts, whether by parol, or in writing, made, or executed, on that day, to be void, and of no validity in law. *Wight* v. *Geer*, 1 *Root* 474. But they have ever held promissory notes, and other contracts, which were executed on *Saturday* evening, or after sunset on the evening of the *Sabbath day*, to be binding and valid. In *Carpenter* v. *Crane*, 1 *Root* 98., a promissory note executed at 2 o'clock on *Sunday* morning, was judged valid; and the court decided, on demurrer, that it was not given and executed on the *Lord's day*. In *Mumford & al.* v. *Buel*, 1 *Root* 145., an arrest by execution on *Saturday* night, after the darkness had commenced, and a promissory note executed by the debtor to procure his release, between the hours of eleven and twelve of the same night, were both adjudged valid; and the court decided, that it is clear the legislature meant by the *Lord's day*, the artificial, or solar day; that although it is agreed, that the *Sabbath* includes the whole of the natural day of twenty-four hours, yet as mankind differ about the question, whether it includes the evening and night preceding, or the evening and night succeeding, the law meant to allow them liberty of conscience, in case they do not disturb others. The law of this state, on this point, is thus laid down, 1 *Swift's Syst.* 367. " Contracts are void, which are made on the *Sabbath*, or *Lord's day*. From sundry adjudications, it appears to be the opinion of the courts, that the transaction of secular business is unlawful, only during the time from morning light, till evening."

The natural day has no fixed time of commencement, in which mankind in general, or the different denominations of *Christians*, are agreed. It is not the business of human lawgivers to determine what is the true time; their only object and duty, in enacting penal statutes, is, not to settle theological disputes, but to guard and protect the rights and morals, the peace and welfare, of society. The solar day is ascertained by fixed and known limits; it is subject to no difficulties, respecting its commencement and close; and is al-

ways understood, in common parlance, by the word, day, as distinguished from evening, or night.

In 1692, a statute was passed in *Massachusetts,* for the better observation of the *Lord's day.* This act, after forbidding all persons to exercise any labour or business, use any game or sport, or travel on unnecessary journies on that day, goes on in these words : " That no person, keeping any public house of entertainment, shall suffer any of the inhabitants of the respective towns where they dwell, to abide and remain in their houses, drinking, or idly spending their time, *on Saturday night after the sun is set,* or on *the Lord's day,* or *the evening following.*" In this clause, the *Lord's day* is expressly distinguished, as a different part of time from the *Saturday* night preceding, and the evening following it, and can only mean the solar day. This statute was, soon after, and certainly before the year 1696, adopted in substance, and nearly in the same words, by the legislature of *Connecticut.* It appears in the edition of 1702 ; and was, for many years after, the only statute relative to this subject. It has been kept in force in every subsequent revision. The same distinction between the *Lord's day,* and the nights preceding and subsequent, is preserved ; and the clause just quoted, constitutes the fifth section of our act, for the due observation of the *Sabbath.* According to the rules of construction, the words, *Lord's day,* must be understood in the same manner, in every part of the statute— must exclude the *Saturday* and *Sunday* nights, and can mean only the solar day. This construction has been put upon the statute, by our courts, from the earliest period to which we can trace their decisions ; particularly, on the sections, which prohibit all persons from assembling in companies, travelling on journeys, or going from their places of abode, except to attend public worship, on the *Lord's day.*

I am of opinion, that a new trial should be granted.

EDMOND, J. Concurred in the opinion given by the Chief Justice.

SMITH, J. The only question for consideration in this case, is, whether service of civil process before day-light on *Sunday* morning, is a violation of the statute entitled " An act for the due observance of the *Sabbath,* or *Lord's day.*"

The section, which more especially relates to this case, is in the following words : " And if any civil process be issued or served on the *Lord's day*, it shall be void, and of no effect ; and the officer who shall serve the same, on said day, shall pay a fine of one dollar and sixty-seven cents, and all damages that shall accrue to any person thereby." A correct result in this case, depends on discovering what period of time is here intended by the *Lord's day.*

This, in my view, does not depend on the common law of *England ;* nor on discovering when the *Jewish Sabbath* began, or ended.

As little does it depend on the time of beginning or ending the *Christian Sabbath,* as an article of religious faith and practice.

The intention of the legislature is, in my opinion, perfectly manifest, from the *statute itself ;* and it is a little remarkable, that the same phraseology is adopted in the other parts of the statute, when prohibiting the great variety of acts therein mentioned. I would, then, attend to the statute, and see from thence what is the meaning of the legislature.

And I would here remark, that the same phrase must have a similar construction whenever found in the same statute.

I think, it will fully appear, that the *day time only* of the *Christian Sabbath,* or that period between the rising and setting of the sun, was intended to be comprised within the prohibitory clauses of the statute. For this we find a strong reason in the different opinions which prevail among *Christians* as to the proper evening to be kept as a part of the *Sabbath ;* so that neither evening could be sanctioned by law as a part of the *Christian Sabbath,* consistently with that spirit of toleration, which has ever characterized the people of this state. With the utmost propriety, then, in my opinion, has the legislature confined its coercive sanctions, to that period of time in which *Christians* generally unite. In opposition to this opinion, the court on the circuit, decided, that by the *Lord's day* is intended the whole of a common law day, beginning and ending at midnight. Which of these opinions is correct, I think, will clearly appear by a particular attention to the statute.

By the 1st section of the statute, all persons, of every description, are required carefully to apply themselves to the duties of religion and piety, during the *Lord's day.* But I

can hardly imagine it could be intended, that *Christians*, who conscientiously keep *Saturday* evening as a part of the *Sabbath*, should also be bound, under a penalty, to devote *Sabbath* evening to the duties of religion and piety.

By the 2d section, all secular business is prohibited, except only works of necessity and mercy, *on the Lord's day, or any part thereof.* The latter words in this section were inserted, probably, to prevent any conclusion, that the prohibition might be confined to the period of divine service. But will it be contended, that this section extends to *Sabbath evening*, so that those *Christians*, who consider themselves bound in conscience to abstain from all secular business on *Saturday* evening, shall become offenders against the laws, and be subjected to penalties, for attending to the least trifle of secular business on *Sabbath evening?*

The 3d section prohibits all travelling on the *Lord's day*, under a penalty. But was it ever supposed, that a man became an offender by travelling on the *evening* of such day?

The 4th section provides, that no person shall go from his or her place of abode on the *Lord's day*, unless to attend the public worship of God, or to do some work of necessity and mercy : and it is well known, that a very numerous and respectable portion of our citizens have been scrupulously exact in keeping *Saturday* evening, who would feel the highest repugnance at leaving their homes to visit a neighbour or friend, on any portion of time, which they suppose constitutes a part of the *Christian Sabbath*, but who have been in the constant habit of making and receiving visits, on *Sabbath* evening. The decision in this case, determines whether all such have been offenders against the laws of the state, and exposed to public justice.

In the 5th section, the intention of the legislature is still more conspicuous ; and with a small degree of attention to its contents, I cannot persuade myself, that a doubt will remain. We here find it made penal to convene and remain at public houses, drinking, or idly spending time, *on Saturday night, after sun-set, or on the Lord's day, or on the evening following.* Now, after reading this section, will any one ask what period of time was intended by the *Lord's day*, in this statute ? Is it not a period altogether distinct from the evening ? If not, why add a provision for the evening ?

Again : if the phrase I am commenting upon necessarily denotes a period of time ending at midnight, then the evening following would be *Monday evening.* But no one will contend, that the legislature could intend to embrace *Monday* evening within the provisions of an act entitled " An act for the due observance of the *Sabbath,* or *Lord's day* ;" especially, as no similar provision is made for the other evenings in the week.

This section, so full of absurdities, upon the hypothesis, which I oppose, harmonizes, most perfectly, with my own views on the subject : for while the statute leaves all denominations of *Christians* to the exercise of their own conscience, as to the proper evening to spend in the duties of religion and piety, and which to devote to the ordinary concerns of life, it takes special care that no noise or disturbance shall be permitted to interrupt the devotions of any.

Of the same character is the 10th section, which inflicts a penalty for disturbing any assembly of people met for the worship of God, on the *Lord's day, or any other time.*

And in the 9th section, where an earlier period was intended to be embraced than had been contemplated by the other parts of the statute, we find a variation in the language ; and the sailing of vessels is prohibited any time after *the morning light.* This became necessary ; otherwise, a vessel getting out of harbour before sun-rise, might sail the whole day, without violating any law.

It has been said, that it must be highly improper to permit the arresting people immediately before and after the rising and setting of the sun on the *Sabbath.* Whether this be an evil greater than that of affording protection to fraudulent debtors, I very much doubt. In *England,* it has been decided, that arrests may be made, in civil process, on the *Sabbath,* on the ground that it is a ministerial act, differing from judicial proceedings ; and that it is a work of necessity. *Mackally's* case, 9 *Co. Rep.* 66. S. C. *Cro. Jac.* 280. But how this may be, as a point of policy, I shall not undertake, at present, to decide. The legislature can make any regulations, which may be deemed necessary. But whatever protection may be afforded by law, to those *Christians,* who keep the evening succeeding the *Lord's day,* I presume will be extended equally to those who keep the preceding evening ;

otherwise, I should not hesitate to pronounce it partial, une-
qual, and unjust.

*Hartford,*
June, 1818.

Fox
*v.*
Abel.

Were this opinion unsupported by any adjudged case, I
should have no doubt of its correctness. But as early as the
year 1785, this statute came under the consideration of the
superior court, in the case of *Carpenter* v. *Crane,* reported
in the 1st volume of *Root's Reports,* page 98. when it receiv-
ed the construction which I now believe the correct one.
That was decided, if I mistake not, during the period when
*Law, Sherman* and *Ellsworth* composed a part of the court;
a period, when the decisions of that court were entitled to
as high respect as they ever were at any period. It is true,
the question has never been decided by this Court, until now.
But this has been, because the decision in the case of *Carpen-
ter* v. *Crane,* has been universally acquiesced in, and has
governed all the cases which have come before the superior
court, wherein the question has arisen.

BRAINARD, J. The questions are, What is the *Christian
Sabbath ?* And, What, in *Connecticut,* is the *Sabbath ?* Wheth-
er the *Christian Sabbath* comprehends one seventh part of
time, one seventh part of a week ; and if it does, whether the
*Sabbath* of *Connecticut,* is, by law, the same ?

That the *Christian Sabbath* consists of one seventh part of
time, the religious observance of which is of moral and per-
petual obligation on the consciences of all professing *Chris-
tians,* I think, there can be no doubt.

In six days the LORD made the heavens and the earth,
and rested the seventh. On the completion of this stupen-
dous work of Omnipotence, in six days, GOD blessed the
seventh, and sanctified it.

In reference to time, GOD, to declare, by his divine command,
what portion should be observed as holy, divided it into days,
each consisting of an equal number of hours. On the seventh
day, GOD rested from his work, and blessed and sanctified it.

Did this seventh day, which GOD blessed and sanctified,
consist of the same portion of time, as each of the six prece-
ding days, in which, according to language adapted to our
comprehension, GOD is said to have made the heavens and
the earth ?

Whoever reads and believes the concise and sublime ac-
count given by *Moses* of this astonishing work of creation,

*Hartford,*
June, 1818.

Fox
*v.*
Abel.

cannot doubt that one seventh part of time, one day in seven, containing twenty-four hours, was blessed and sanctified—a *Sabbath,* holy unto the LORD.

This is expressly confirmed in the decalogue. " Six days shalt thou labour, but the seventh is the *Sabbath* of the LORD, thy GOD ; in it thou shalt not do any work."

Can it be supposed, that the ALMIGHTY, declaring his commandment from *Sinai,* and prescribing the same order and distribution of time, which he did in the creation, intended, that this seventh day should be wanting in measure, and destitute of proportion ? Indeed, on this point, *Exodus* xxiii. 10—12. I think, is conclusive. " Six years shalt thou sow thy land, &c. but the seventh thou shalt let it rest," &c. " Six days thou shalt do thy work ; and on the seventh, thou shalt rest." Can there be a question, but that this seventh year was an *entire* year ; and this seventh day, an *entire* day ?

If this be the *Jewish,* what is the *Christian Sabbath ?*

On the authority of the resurrection of our *Saviour,* the day of the *Sabbath,* in the view of *Christians,* generally, is altered ; but the portion of time, not varied : the *Christian Sabbath,* in point of duration, is the same as the *Jewish.*

On this great and miraculous event, the resurrection of our *Saviour,* the seventh day was postponed, and the first substituted. The seventh day, or *Jewish Sabbath,* receded, and gave place to the first day, or *Christian Sabbath.*

To determine when the first day, or *Christian Sabbath,* commenced, it is necessary to determine when the seventh day, or *Jewish Sabbath,* closed. Settling this point, I think, settles the question ; for when the one ends, the other begins.

I think, it is apparent, that those who visited the sepulchre of our *Saviour,* on the morning of his resurrection, did not do it, until after the expiration of the *Jewish Sabbath ;* and that they calculated to visit it as soon after as they could, consistently with *a due observance* of the *Sabbath.* No mortal approached the sepulchre until after the end of the *Sabbath.*

From nothing I have ever read, not from the *Evangelists* themselves, can I ascertain the precise time of the resurrection of our *Saviour ;* and I presume it was not given for mortals to know it. " An angel rolled away the stone from the door of the sepulchre." From the whole tenour of the *Evangelists,* although there is not a perfect coincidence, as to the time of going to the sepulchre, (nor is it necessary, for any *Christian*

purpose, that there should be,) yet it is perfectly apparent, that those who went, had calculated to go as soon as they could, without a breach of the *Sabbath*. They did not go at the setting of the sun; nor immediately after twilight of the *Jewish Sabbath*; not until after midnight; not until towards the dawning of the day.

" In the end of the *Sabbath*, as it began to dawn toward the first day of the week, came *Mary Magdalene*, &c. to the sepulchre."

" And when the *Sabbath* was past, *Mary Magdalene*, &c. very early in the morning, the first day of the week, came unto the sepulchre."

" Now upon the first day of the week, very early in the morning, they came unto the sepulchre."

" The first day of the week, came *Mary Magdalene*, early, while it was yet dark, unto the sepulchre."

From a full view of the subject, I think we may fairly conclude, that, in point of quantity, and measure of time, the *Jewish* and *Christian Sabbath* are the same; each consisting of an entire day of twenty-four hours; one seventh part of a week: that the *Christian Sabbath* commenced, when the *Jewish Sabbath* closed—*at midnight*.

Having examined and seen what is a *Jewish*, and what a *Christian Sabbath*; it remains to enquire, what is the *Sabbath* in *Connecticut*; whether it be still a *Christian*, or an *artificial Sabbath*—a day without morning or evening.

It is said, that although the *Christian Sabbath*, in point of duration, is morally commensurate with the *Jewish*; yet it is not, in the same extension, legally binding in *Connecticut*. To this distinction, if true, I must submit; but it is a distinction I cannot subscribe to: it is a distinction, which I cannot believe our pious ancestors ever intended to make, or countenance. They intended to embrace, and did, in fact, embrace, the whole *Christian Sabbath*. They not only adopted, but, in legislative phraseology, *enacted*, the *Sabbath*. They passed " An act for the due observation of the *Sabbath*, or *Lord's day*." By this, I understand the *Christian Sabbath*; that portion of time, known and acknowledged as such, by professing *Christians*. The language of the statute is, " No person shall do any manner of secular business on the *Lord's day*, nor any part thereof." " No civil process shall issue, or be served, on the *Lord's day*." I would ask, if a magis-

*Hartford,*
*June, 1818.*

Fox
*v.*
Abel.

trate were called on for a process, fifteen minutes before the dawn of the morning of the *Sabbath,* on *what day* would he date it—on *what day* would it *issue?*

There are, however, exceptions in the statute, to a strict and rigid observance of the whole time, as to some things. These are founded on the claims of necessity and mercy.

An exception proves the rule. The statute says, " That no vessel, on the *Lord's day,* between the morning light and the setting sun, shall unnecessarily depart," &c. That is, no vessel shall unnecessarily depart on *that portion* of the *Lord's day,* which is between the morning light and the setting sun ; plainly declaring, that the *Lord's day* comprehended more time, than " between the morning light and the setting sun."

I am aware, that the principles I have adopted, with regard to the precise *time* of the *Sabbath,* do not perfectly agree with the practice of our ancestors ; I mean, the first settlers of *Connecticut,* and *New-England* generally ; but they do not vary as to quantity and portion. *They,* in general, commenced the observance of the *Sabbath,* at the setting of the sun, and continued it an entire day, with a decent regard to the evening succeeding.

On the whole, I take the *Sabbath,* or *Lord's day,* to be, in *Connecticut,* a natural day, consisting of twenty-four hours ; that the *Christian Sabbath,* is, by law, here recognized ; and whether the whole of the night preceding the artificial day— or only that portion immediately succeeding midnight, is to be comprehended, as respects the present case, is immaterial.

I think the charge was correct ; and that a new trial ought not to be advised.

HOSMER, J. The plaintiff was arrested on execution, a few minutes before the break of day, on *Sabbath* morning. He complains of this as having been an unlawful arrest. Whether it is of this description, depends, entirely, on the statute relating to the *Sabbath.*

It is unnecessary to discuss the question, when the *Christian Sabbath* actually commences. On this subject, there exists much diversity of opinion ; and this, probably, was the reason for the peculiar provision made by the act " for the due observation of the *Sabbath.*" All *Christians* in this state, consider the *solar* day, that is, from the rising to the

*Hartford,*
June, 1818.

Fox
*v.*
Abel.

setting of the sun, as holy time. To protect this period from violation, by amusement or secular business, was considered as most obviously proper, as it harmonizes with the sentiments of all denominations of *Christians.* In respect of the evening preceding the solar day, or subsequent to it, some *Christians* have considered the former, and others the latter, as pertaining to the *Sabbath.* One, for example, holds the day to commence with *Saturday* evening; another fixes the commencement of it at 12 o'clock at night; and others, at day-light, or the rising of the sun. In the spirit of the most liberal toleration, the legislature determined not to interfere with the opinions of any sect of *Christians,* but to require the observance of that part of holy time, in which they universally agreed. Accordingly, in the 5th section of the act, alluded to, no inn-holder is permitted to suffer the inhabitants of the town in which they dwell, to remain in his house, drinking, or idly spending their time, " on *Saturday* night after sun-set, or *on the Lord's day,* or on the evening following." The expression, " *the Lord's day,*" as used in the statute, is here precisely defined. It neither includes the evening before, nor the evening after. In the 9th section, the *Lord's day,* for the purpose of prohibiting the navigating of vessels, commences with morning light, and extends to the setting sun. The words, *the Lord's day,* as they were understood by the legislature, in the act made by them, include the day-light only. All the clauses of the statute, in which this expression is used, must receive a similar construction. The decisions which have repeatedly been had, establish the opinion I have expressed. *Carpenter* v. *Crane,* 1 *Root* 98. *Mumford & al.* v. *Buell,* 1 *Root* 145.

The Court is not called on to limit the time, which the inhabitants of the state are to consider as comprising the *Sabbath.* Undoubtedly, whenever this period commences, it must include twenty-four hours, or one-seventh part of the week. Neither is the question here to be settled, whether a person may, consistently with a good conscience, transact secular business the evening before the *Sabbath day,* or the evening after. Every person must decide, on this subject, for himself. The question before us, is not, what is the duty of a *Christian,* but, what is the construction of a law? The statute has defined its own most operative expression, " the *Lord's day :*" it has, in compliance with the conscientious

*Hartford,*
June, 1818.

Fox
*v.*
Abel.

belief of individuals, left them to observe the evening before, or after the *Lord's day,* according to the operation of their own minds ; and has placed them under a prohibition, only in respect of that portion of time, in which they all agree. It is our business, *jus dicere, non dare.* I have no hesitation in saying, that the act complained of, by the plaintiff, is not in contravention of law ; and that the action brought cannot be sustained.

GOULD, J.   With respect to the question, at what hour, or season, of the natural day, the *Sabbath,* or holy time, commences, different rules are adopted, by *Christians* of different persuasions, even in one and the same country, or state—as is the case here.   The question, which has grown out of these discordant rules, has occasioned, as is well known, much clashing of opinion, and no small controversy. But this question, considered as involving matters of conscience, or as a problem in theology, is, in my judgment, entirely unconnected with the construction of the statute for the observance of the *Sabbath,* and therefore entirely foreign to the subject before us.

The 12th section of the act, (the section upon which the present question immediately arises), provides, that " if any civil process shall be issued, or served, on the *Lord's day ;* it shall be void, and of no effect."   Neither this provision, nor any other, contained in the statute, expressly points out, at *what period* of the natural day, that portion of time, denominated the " *Lord's day,*" shall commence : but it is very manifest, I think, upon various grounds, that, by the term " *Lord's day,*" as used in this section, and several others of the same statute, is meant, not that portion of time, which constitutes any one natural, or mean solar *day,* as distinguished from another ; but that *part* of a natural day, which is distinguished from *night,* and which is exclusive of the seasons of morning and evening twilight : (since *night,* in the comprehensive sense of the word, includes both those seasons.)   For it was, evidently, no more the object of the legislature, to prescribe *what portion* of each week ought, in a religious view, to be observed, as holy time, than it was to point out, at *what hour,* on each *Sunday,* considered as a natural day, that portion of time ought to commence : but, to prevent the transaction of secular business, and the disturbance, which

must attend it, during *that part* of *Sunday*, which was supposed to be hallowed, by *Christians* in general, of *all* denominations, *viz.* that period, which elapses between the rising and setting of the sun.

That this was the only object of the clause in question, is evident, in the first place, from the *practical* construction, which, by the immemorial and universal usage of the state, has been given to the term " *Lord's day*," as used in several other parts of the same statute. The 2d section enacts, among other things, that no person shall " do any manner of *secular business*, *work*, or *labour*, (works of necessity and mercy, excepted,) nor use any sport, &c. or *recreation*, on the *Lord's day*, or any part thereof." And no one will deny, I trust, that the term, " *Lord's day*," in this section, has the same meaning, as in that, which relates to the service of civil process. But it is a fact of universal notoriety, that, though the practice of all *Christian* denominations, as to the hours, to be observed, as holy time, is not the same ; yet, secular employments of any kind, and most ordinary recreations, are openly and freely pursued, as convenience, or inclination dictates, by all persons, not prevented by *religious* scruples, or habits ; and in every part of the state, as well on that, as on any other, day, except in the *day* season. And this, so far as we have any knowledge upon the subject, has always been the case.

By the 3d section, it is provided, that " no traveller, &c. shall *travel* on the *Lord's day*, except from necessity, or charity :" by the 4th, that " no persons shall *convene* and *meet* together, in companies, in the streets, or elsewhere ; nor go from his or her *place of abode*, on the *Lord's day* :" and the 19th contains a special provision, for the *arrest* of all persons, " unnecessarily travelling, on the *Sabbath*, or *Lord's day*." But it is as notorious as any matter of common experience, that by a universal practical construction, in which the whole people, and the whole body of the magistrates, of the state, have concurred, these several provisions have been limited, like those of the former section, to the *artificial* day ; *i. e.* to that part of the natural day, which begins at the rising, and ends at the setting, of the sun. And as to the 12th section, out of which the present action has arisen, there is certianly no novelty, in serving civil process in the night season, either of *Saturday*, or *Sunday* ; nor does it appear, that the

Hartford, June, 1818.

Fox *v.* Abel.

practice has ever, till now, been called in question. This long continued usage, this practical exposition, uniformly acquiesced in, by all classes of people, and by the legislature also, would seem alone sufficient to put the question at rest.

All our judicial decisions, also, which relate to the question, conform to this general understanding and usage. The execution of a written instrument of any kind, on *Sunday*, between sun-rise and sun-set, has always been holden to be within the second section of the act, as falling within the description of " secular business ;" and the instrument so executed, has, therefore, always been adjudged void. But in the case of *Mumford* v. *Buell*, 1 *Root* 145. the superior court held a note, executed between the hours of eleven and twelve, on *Saturday* night, to be valid. In *Carpenter* v. *Crane*, 1 *Root* 98. the decision was the same way, as to a note executed at 2 o'clock, on *Sunday* morning. And in *Sheldon* v. *Hunt*, determined by the same court, in the year 1812, in the county of *Litchfield*, the rule, laid down in the direction to the jury, was, that a note, made after sun-set, on *Sunday*, was good. Now, presuming, as we certainly must, and as I have done, that the term, " *Lord's day*," means the same thing in the 12th, as in the 2d section, these cases appear to me decisive of the question.

But a still stronger ground, (if any can be so,) for the construction I have adopted, is furnished by the 5th section, which professedly extends its provisions *beyond* the *Lord's day* ; and which enacts, that " no inn-holder, &c. shall entertain, or suffer any of the inhabitants of the respective towns, where they dwell, to abide, or remain in their houses, drinking, or idly spending their time, on *Saturday night*, after sun-set, or on the *Lord's day*, or on the *evening following*, upon the penalty," &c. This phraseology furnishes complete demonstration, 1st, that the " *Lord's day*," as the term is used in this section, does not signify a natural, or mean solar, day, of twenty-four hours ; and, 2dly, that it does not include *any part* of *Saturday* night, or of *Sunday* evening : both these being expressly distinguished from it. But the word, " evening," according to its popular, and only prevailing, acceptation, here, denotes that season of the natural day, which commences at sun-set, and comprehends the first part of the night : and by " *Saturday* night," is evidently meant, that period, which extends from the setting of

the sun, on *Saturday*, to its rising, on *Sunday : Night*, both in the correct, and the popular acceptation of the word, being the correlative, not of morning, or evening, but of *day*—that is, of the *artificial* day.

This last section, I confess, appears to me sufficient to remove all grounds of doubt, if any might otherwise remain. The arrest in question was, therefore, according to every view that I have been able to take of the subject, a lawful one. And the defendant is, of course, entitled, in my opinion, to a new trial.

PETERS, J. As our decision must depend on the construction of a statute, I lay out of the case all arguments drawn from the *Sabbatism* of *Jews* and *Christians*. " If any civil process be issued, or served, on the *Lord's day*, it shall be void."*(a)* What, then, is the *Lord's day*, by statute ?

The object of the legislature was not to establish an article of faith, but a rule of practice ; to preserve the peace of society ; and protect its members from disturbance, on a day usually devoted to public worship. When our ancestors separated from the church and state of *England*, a notion prevailed, sanctioned expressly by royal authority, and implied by an act of parliament,*(b)* that " lawful sports and pastimes" were proper " after divine service, on the *Lord's day* :"*(c)* Hence the prohibition of certain acts, on that day, " or any part thereof." This expression is first found in the statute 29 *Car*. 2. *c*. 7. when the king yielded many odious measures and prerogatives to public opinion. This statute, qualified by a few *New-England* peculiarities, was soon adopted in *Connecticut*,*(d)* and still remains in force. Our first printed statutes simply prohibit the profanation of the *Sabbath*, by unnecessary travel or playing thereon, in time of public worship, or before or after.*(e)* This being found too indefinite, the present provisions relative to the evening " preceding and succeeding the *Lord's day*" were adopted, in *May*, 1676, from an act of *Massachusetts*, passed in 1658 ; the preamble*(f)* of which shows the precise object of the legislature, and the extent of the statute *Sabbath :* " Whereas, by too sad experience, it is observed, the sun being set, both

(a) 1 *Stat. Conn. tit.* 140.   (d) Revision of 1702. *p.* 105.
(b) 1 *Car.* 1. *c.* 1.   (e) Revision of 1672. *p.* 58.
(c) 8 *Hume* 277. 9 *Hume* 191.   (f) Edition of 1672. *p.* 133.

every *Saturday,* and on the *Lord's day,* young people and others take liberty to walk and sport themselves in the streets and fields, to the dishonour of GOD, and the disturbance of others in their religious exercises, and too frequently repair to houses of publick entertainment, and there sit drinking; all which tends not only to the hindering of *due preparation for the Sabbath,* but, as much as in them lieth, renders the ordinances of GOD unprofitable." Had the legislature intended to define the *Christian Sabbath,* as a seventh part of time, they would not have united *two nights* in one day; and if to include any night, their provisions respecting the evenings were superfluous and unreasonable; as they had already prohibited secular business and amusements on " every part" of that day, under a heavier penalty; and they deprived the citizens of a right of conscience, always enjoyed, of choosing which evening to observe.

It is contended, that the prohibition of the sailing of vessels " between the morning light and the setting sun,"(*a*) demonstrates that the legislature did not consider that period as the whole of the *Lord's day.* But, to my mind, this proves the reverse. By " morning light" our ancestors undoubtedly understood " the rising sun." This furnished a fixed and unerring standard; and the words are so defined by the best lexicographer(*b*) of that day; and it is said, by a writer of great authority,(*c*) that " antiently the day was accounted to begin only at sun-rising, and to end immediately upon sun-set."

But the universal and immemorial usage of our country seems to have settled this question. Who ever heard of a prosecution for *Sabbath-breaking,* by secular business done in the *night?* Though the learned counsel have retraced the history of the *Sabbath,* from the reports of our late Chief Justice, to the " first reporter,"(*d*) they have not produced a single decision, or judicial *dictum,* wherein service of civil process was holden void, or secular business punishable, unless done on the *solar Sabbath.*

But we need not rely on usage. The repeated adjudications of our courts, and the acquiescence of counsel, are " confirmation strong" of professional and public opinion.

In *Carpenter* v. *Crane*, in 1785,(*a*) the late Governour *Huntington*, then Chief Justice, *Dyer, Sherman, Pitkin* and *Law*, Js. decided, that " secular business is not forbidden at two o'clock in the night season preceding the *Sabbath*." We are, indeed, informed by the Chief Justice, who was of counsel in that case, that this doctrine was not then promulgated. But, with due deference, his Honour's recollection seems at variance with the *record*, as well as the report. The idea certainly was not then new ; as in the summary of the laws of *Massachusetts*, printed in 1672, it is said, that " by the *Lord's day* is meant *day-light*." In *Mumford & al.* v. *Buell*, in 1789,(*b*) the same doctrine was promulgated by *Law*, Ch. J., *Dyer, Adams, Root* and *Chauncey*, Js. These " venerable sages of the common law," some of whom had adorned the bench for nearly thirty years, in their reasons on file, expressly say, that " the legislature, by *Lord's day*, meant the artificial, or solar day." This was in relation to an act done between eleven and twelve o'clock in the evening of *Saturday*, and is entitled to the greater respect, as all these judges were of a denomination, who have generally considered *Saturday* evening as a part of the *Christian Sabbath*. And in *French* v. *Huntington*, in 1811,(*c*) *Mitchell*, Ch. J., *Trumbull* and *Ingersoll*, Js. made a similar decision in relation to business done at nine o'clock in the evening of the *Lord's day*, not on the mere authority of precedent, but a careful examination of the statute. Though I do not consider these authorities binding on this Court ; yet they furnish, to my mind, satisfactory evidence of what, until the decision in question, I believe, always was, and, I trust, always will be, considered a sound construction of the statute. A contrary construction would render our jurisprudence more rigid than the *Pentateuch*,(*d*) or the " *blue laws*" of our ancient neighbours ;(*e*) under which we have never heard, that a man was ever punished for " gathering sticks," or " kissing his wife," in the *night* season.

I, therefore, advise a new trial.

CHAPMAN, J. was of the same opinion.

New trial to be granted.

